IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ANDREW BROWN, individually,
and on behalf of a class of all persons
similarly situated,

      Plaintiff,

      v.

FIRST TENNESSEE BANK
NATIONAL ASSOCIATION,
individually and d/b/a FIRST
HORIZON HOME LOANS,

      Defendant.

CIVIL ACTION FILE

NO. 1:09-CV-0679-BBM

## O R D E R

This matter is before the court on two Requests for Judicial Notice [Doc. Nos. 9, 26], a Motion to Dismiss Plaintiff's Class Action Complaint [Doc. No. 10], and a Motion to Dismiss the First Amended Complaint [Doc. No. 24], all filed by Defendant First Tennessee Bank National Association ("First Tennessee"), which does business as First Horizon Home Loans ("First Horizon").[1] Plaintiff Andrew Brown ("Mr. Brown") has filed Plaintiff's Motion for Hearing [Doc. No. 23].[2]

---

[1] In the original Complaint, Plaintiff named First Horizon Home Loan Corporation as Defendant. First Horizon is a division of First Tennessee. (See Mot. to Dismiss Pl.'s Class Action Compl. 1 & n.1.) In his Amended Complaint, Plaintiff properly names First Tennessee as Defendant. (See Am. Compl. 1.) However, throughout their filings, both parties refer to Defendant as First Horizon. In an effort to maintain consistency, the court will do the same.

[2] As a preliminary matter, Rule 15(a)(1) of the Federal Rules of Civil Procedure states that "[a] party may amend its pleading once as a matter of course . . . before being served

## I.   <u>Factual and Procedural Background</u>

On a motion to dismiss, the court accepts as true all factual allegations set out in the plaintiff's complaint. <u>See</u> <u>Lotierzo v. Woman's World Med. Ctr., Inc.</u>, 278 F.3d 1180, 1182 (11th Cir. 2002). The following overview of the facts is derived from the Amended Complaint, and does not constitute findings of fact by the court.

Mr. Brown resides in Fayetteville, Georgia. (Am. Compl. ¶ 1.) On February 26, 2007, First Horizon through its settlement agent, closed a Department of Veterans Affairs ("VA") Interest Rate Reduction Refinancing Loan ("IRRRL"),

---

with a responsive pleading." Fed. R. Civ. P. 15(a)(1). Though First Horizon filed its Motion to Dismiss Plaintiff's Class Action Complaint before Mr. Brown amended his Complaint, this filing is not a responsive pleading for Rule 15 purposes. <u>Williams v. Bd. of Regents of Univ. Sys. of Ga.</u>, 477 F.3d 1282, 1291 (11th Cir. 2007). Therefore, the court relies upon the allegations of the Amended Complaint, which supersedes the former pleading. <u>Dresdner Bank AG v. M/V OLYMPIA VOYAGER</u>, 463 F.3d 1210, 1215 (11th Cir. 2006) ("[T]he original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary." (citation and internal quotations omitted)).

Because Mr. Brown's Amended Complaint supersedes his original Complaint, the Defendant's Motion to Dismiss Plaintiff's Class Action Complaint [Doc. No. 10] is moot, and is DENIED as such.

First Horizon has filed two, nearly identical Requests for Judicial Notice. Each asks that the court take notice of the fact "that First Tennessee is, and at all relevant times was, a national bank." (Request of Def. for Judicial Notice in Supp. of Mot. to Dismiss 3 [Doc. No. 26].) Because they prove irrelevant to the following analysis, the court DENIES both requests.

Plaintiff has filed a Motion for Hearing, requesting an opportunity to present arguments related to First Horizon's Motion to Dismiss Plaintiff's Class Action Complaint. (Pl.'s Mot. for Hr'g 1.) However, Rule 12(b)(6) confines the court to the face of the pleadings in its consideration of this Motion to Dismiss. For this reason, there is little that a hearing could do to alter the court's analysis or affect its evaluation of the parties' arguments from their numerous and lengthy briefs. Plaintiff's Motion for Hearing is DENIED.

secured by Mr. Brown's Fayetteville residence. (<u>Id.</u> ¶¶ 1, 28.) During the closing, the settlement agent provided Mr. Brown with a HUD-1 form, with no indication that Mr. Brown was charged either settlement or attorneys' fees. The HUD-1 did show that Mr. Brown was charged $775 as an abstract or title search fee. (<u>Id.</u> ¶¶ 29-30.)

Despite what was written on the face of the document, Defendant, through its agent, did charge Mr. Brown settlement, closing, and attorneys' fees, none of which could "lawfully be charged to the borrower in connection with a VA IRRRL." (<u>Id.</u> ¶ 10.) Specifically, First Horizon's acts violated 38 C.F.R. § 36.4312(d), which limits the charges that a lender can levy against a veteran-borrower for this type of loan. First Horizon disguised its violation of federal regulations by bundling the unlawful fees into the title examination fee. (<u>Id.</u> ¶ 30.) This was "done for the express purpose of shifting the settlement closing and/or attorney[s'] fee, which may not be charged to the borrower under federal law, to the veteran-borrower[.]" (<u>Id.</u>) "This improper 'bundling' . . . is part of Defendant's regular way of doing business as an ongoing entity." (<u>Id.</u>) Not only did its closing agents conceal the unlawful character of these charges, but First Horizon executed a required VA certification that stated it did not charge Mr. Brown any fees in excess of those permitted by federal regulations. (<u>Id.</u> ¶¶ 31, 32); <u>see also</u> 38 C.F.R. § 36.4312(a). Mr.

-3-

Brown says that First Horizon harmed him by "illegally requir[ing] [him] to pay for fees that federal law specifically prohibits lenders from charging such borrowers." (Am. Compl. ¶ 37.)  In return, First Horizon profited through the acquisition of new business and because it "gained the improper attorney[s'] fees that were bundled into [Mr. Brown's] title examination charges."  (Id. ¶ 39.)

First Horizon's misrepresentation of the nature of the fees and its unlawful certification of the HUD-1 were integral elements of a pattern of activity designed "to defraud United States military veteran-borrowers who are led to believe that they are being charged only lawful and authorized charges when, in fact, they are being charged illegal and unauthorized charges."  (Id. ¶ 68.)  "[First Horizon] has committed more than forty and perhaps thousands of the predicate acts . . . in furtherance of [a] scheme to charge U.S. military veteran-borrowers illegal charges in connection with VA IRRRLs."  (Id. ¶ 58.)  To perpetuate this scheme, First Horizon and its agents make use of U.S. mail and wires.  (Id. ¶ 68.)

Mr. Brown alleges that First Horizon's actions form a "regular, systematic, and continuous" pattern of unlawful activity that First Horizon implements today and that will likely continue into the future.  (Id. ¶¶ 68, 71.)  On March 11, 2009, Mr. Brown filed suit against First Horizon.  On May 13, First Horizon filed a motion to dismiss and a request for judicial notice.  Mr. Brown amended his Complaint on

June 4, 2009, and filed a motion for hearing twelve days later.  In his Amended Complaint, Mr. Brown alleges the following counts:  (1) violations of Georgia's Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO"), O.C.G.A. § 16-14-1, et seq.; (2) punitive damages for state RICO liability; (3) violations of the federal Civil Racketeer Influenced and Corrupt Organizations Act ("federal RICO"), in violation of 18 U.S.C. § 1962(c); and (4) federal RICO conspiracy, in violation of 18 U.S.C. § 1962(d).  As relief, Mr. Brown seeks:  (1) damages caused by the fraudulent scheme; (2) special damages; (3) interest on loan principal attributable to the fee that First Horizon allegedly should have borne; (4) RICO penalties, including treble damages, attorneys' fees and costs of litigation, pursuant to O.C.G.A. § 16-14-6(c) for the state claims; and (5) uncapped punitive damages, pursuant to O.C.G.A. § 51-12-5.1(f), as to the state claims.

First Horizon filed its Motion to Dismiss First Amended Complaint and its second Request for Judicial Notice on June 18, 2009.

## II.   <u>Legal Standard</u>

Under Federal Rule of Civil Procedure 12(b)(6), a court may grant a motion to dismiss when a complaint fails to state a claim upon which relief can be granted. To withstand a motion to dismiss, a complaint need not contain "detailed factual allegations," but must "'give the defendant fair notice of what the . . . claim is and

the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). The court must determine whether the plaintiff "has alleged enough facts to suggest, raise a reasonable expectation of, and render plausible" the claims. Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1296 (11th Cir. 2007). The court construes the complaint in the plaintiff's favor, and accepts the facts it alleges as true. M.T.V. v. DeKalb County Sch. Dist., 446 F.3d 1153, 1156 (11th Cir. 2006). However, "a formulaic recitation of the elements of a cause of action will not do," Twombly, 550 U.S. at 555, as "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Thus, a wholly conclusory statement of a claim cannot, without more, survive a motion to dismiss. See Weissman v. Nat'l Ass'n of Sec. Dealers, Inc., 500 F.3d 1293, 1303 (11th Cir. 2007) (citation omitted).

## III.  Analysis

### A.  Federal RICO Claims

First Horizon argues that Mr. Brown's federal RICO claims (Counts III and IV) are defective as alleged and therefore must be dismissed. It asserts that Mr. Brown has failed to adequately allege the existence of (1) a pattern of racketeering activity, (2) an enterprise, or (3) a conspiracy to violate the RICO statute's

substantive provisions.   Accordingly, Mr. Brown has not stated a claim for violations of 18 U.S.C. § 1962(c)-(d) and the claims must be dismissed.

> In relevant part, federal RICO prohibits the following activities:
>
> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
>
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962(c)-(d).  To establish liability under § 1962(c), a plaintiff must prove: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985) (footnote omitted).

First Horizon first argues that Mr. Brown has not alleged sufficient facts to establish racketeering activity.  The Code defines "pattern of racketeering activity" as "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."  18 U.S.C. § 1961(5).  Section 1961 defines "racketeering activity" by listing a series of predicate acts that satisfy the statutory standard. These include: "any act which is indictable under . . . section 1341 (relating to mail

fraud) [or] section 1343 (relating to wire fraud)" of Title 18 of the United States Code.  18 U.S.C. § 1961(1)(B).[3]

Mr. Brown identifies mail and wire fraud as the racketeering activity on which his federal RICO claims are based and, therefore, must allege facts sufficient to satisfy the elements of these offenses.  Accordingly, to survive a motion to dismiss, he must allege that First Horizon "(1) intentionally participate[d] in a scheme to defraud another of money or property and (2) use[d] the mails [and] wires in furtherance of that scheme." Pelletier v. Zweifel, 921 F.2d 1465, 1498 (11th Cir. 1991) (citation omitted).  Because First Horizon has not contested the second of these elements, the existence of racketeering activity turns on whether the lender engaged in a scheme to defraud.  "A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." United States v. Maxwell,  579 F.3d 1282, 1299 (11th Cir. 2009) (citing United States v. Svete, 556 F.3d 1157, 1161, 1169 (11th Cir. 2009) (en banc)); United States v. Hasson, 333 F.3d 1264, 1270-71 (11th Cir. 2003)).  "A misrepresentation is material if it has a natural tendency to influence, or

---

[3]  In relevant part, sections 1341 and 1343 state: "[w]hoever, having devised or intending to devise any scheme or artifice to defraud . . . shall be fined under this title or imprisoned not more than 20 years, or both."  18 U.S.C. §§ 1341, 1343.

[is] capable of influencing, the decision maker to whom it is addressed." <u>Maxwell</u>, 579 F.3d at 1299 (citation and internal quotations omitted).

In his Amended Complaint, Mr. Brown alleges that First Horizon committed fraud by falsely certifying that it had not imposed charges or fees in excess of those that were permissible under 38 C.F.R. § 36.4312.  (<u>See</u> Am. Compl. ¶¶ 31-34.)  This false certification violates the very terms of the regulations.  38 C.F.R. § 36.4312(a).  Mr. Brown also alleges that First Horizon's agents "misrepresented to [Mr. Brown], through the HUD-1 form provided at the closing, that [Mr. Brown] was not . . . charged a settlement closing and/or attorney[s'] fee when, in fact, [Mr. Brown] was . . . charged such a fee by the inclusion of the fee in the charge for title examination." (<u>Id.</u> ¶ 30.)  Through this bundling, "First Horizon and the closing lawyers . . . defraud[ed] United States military veteran-borrowers who [were] led to believe that they [were] being charged only lawful and authorized charges when, in fact, they are being charged illegal and unauthorized charges."  (<u>Id.</u> ¶ 68.)  The court must, therefore, evaluate whether these misrepresentations are sufficient to give rise to criminal liability under sections 1341 and 1343 and, consequently, sufficient to serve as predicate racketeering acts for RICO purposes.

VA regulations, promulgated by the Secretary of Veterans Affairs ("Secretary"), limit the types of fees that a lender may charge a veteran-borrower

who seeks an IRRRL.  38 C.F.R. § 36.4312(a) ("No charge shall be made against, or paid by, the borrower incident to the making of a guaranteed or insured loan other than those expressly permitted under paragraph (d) or (e) . . . ."); <u>see also</u> 38 U.S.C. § 3714(e) ("The Secretary shall establish in regulations a reasonable amount as the maximum amount that a lender may charge for processing an application for a creditworthiness determination and assumption of a loan pursuant to this section."). Neither attorneys' fees nor settlement fees are included within the discrete list of permissible charges.  <u>See</u> 38 C.F.R. § 36.4312(d)-(e).  While lenders may charge a flat origination fee "in lieu of all other charges relating to costs of origination not expressly specified and allowed in this schedule[,]" the Secretary has capped this fee at one percent of the total amount of the loan.  38 C.F.R. § 36.4312(d)(2).  Lenders must certify compliance with fee restrictions in order to secure the VA's guaranty on the IRRRL.  38 C.F.R. § 36.4312(a).  Mr. Brown alleges that First Horizon violated these regulations.

In its Motion to Dismiss the Amended Complaint, First Horizon contends that Mr. Brown has not established the requisite predicate acts of mail and wire fraud. (<u>See</u> Mem. in Supp. of Mot. to Dismiss Am. Compl. 8 [hereinafter Mot. to Dismiss].) Specifically, the lender argues that Mr. Brown's pleadings are inadequate because his allegations of mail and wire fraud "are nothing more than purported violations

of VA guidelines pled under the guise of RICO." (Id. at 11.) First Horizon urges the court to adopt the position that no cause of action may lie because the VA regulations provide administrative, rather than judicial, remedy for violation of their terms.

When Congress expresses a desire to remedy a deprivation of a federal right with administrative relief, plaintiffs may not use civil RICO claims that are premised on mail and wire fraud as an end-around legislative intent. See, e.g., Ayres v. Gen. Motors Corp., 234 F.3d 514, 524-25 (11th Cir. 2000). In this type of case, a court's first line of inquiry is whether there exists an express or implied right of action in the violated statute or regulatory provision. See McCulloch v. PNC Bank Inc., 298 F.3d 1217, 1226 (11th Cir. 2002). Where no such cause of action exists, the court looks to the regulations and the underlying statute to determine if Congress has established an administrative system through which violations are remedied. Id.; Ayres, 234 F.3d at 522 ("In light of this extensive administrative scheme, we think it clear that Congress did not intend to equate a violation of the Safety Act's notification requirements in and of itself with the felony of mail or wire fraud."); see also Danielsen v. Burnside-Ott Aviation Training Ctr., Inc., 941 F.2d 1220, 1227 (D.C. Cir. 1991) ("[W]here Congress has established such a regulatory scheme, the specification thereof normally excludes duplicative judicial jurisdiction.

-11-

This is especially true in a scheme such as the [Service Contract Act] where Congress provided the statutory right for a limited and governmental cause of action[.]" (citations and internal quotations omitted)).

First Horizon contends, and Mr. Brown does not contest, that neither the VA's guidelines nor the agency's various publications extend a private cause of action to borrowers for violation of VA regulations. The Eleventh Circuit has not directly addressed the question of whether a lender's violation of the loan fee regulations confers a private right of action to veteran borrowers. However, in litigation stemming from foreclosures on loans similar to IRRRLs, the court has rejected the notion that VA guidelines and agency publications give rise to either an implied or express cause of action. See Bright v. Nimmo, 756 F.2d 1513, 1516 (11th Cir. 1985). Though not directly on point, the Bright court's analysis in reaching this conclusion gives guidance in cases of lender noncompliance with fee regulations.

In Bright, the court cited with approval to a D.C. Circuit case holding that veteran-borrowers "'lack[] any express or implied right of action in federal court to enforce duties V.A. and lenders may have pursuant to V.A. publications. . . .'" Id. (quoting Simpson v. Cleland, 640 F.2d 1354, 1359 (D.C. Cir. 1981)). The Bright court also accepted the Ninth Circuit's conclusion that "neither the statutory language nor the legislative history of the VA Act provides any indication of legislative intent .

. . to create such a remedy against the private lender." Id. (citations and internal quotations omitted).

To reach this conclusion, the Ninth Circuit looked to the legislative history of the underlying VA Act, and determined that a private cause of action would be inconsistent with Congressional intent: "The home loan guaranty program was designed to *induce private lenders to extend home loans to veterans* — with 'the guaranty provisions . . . operat(ing) as the substantial equivalent of a down payment.'" Rank v. Nimmo, 677 F.2d 692, 697 (9th Cir. 1982) (emphasis added) (quoting United States v. Shimer, 367 U.S. 374, 383 (1961)).  Congress designed the VA loan guaranty program to encourage private lenders to make affordable loans to veterans and "relie[d] on financial incentives to accomplish [this] welfare objective[.]" Id. at 697, 699 n.12 (citations omitted).  Again, though these cases arise out of foreclosure avoidance, their logic affords guidance in the matter before the court.  Because Congress's objective was to create incentives for private lenders to issue affordable loans to veterans, it would be inconsistent to hold that it also "confer[red] enforceable federal rights directly on the veteran-borrower" to enforce compliance with the regulatory provisions.  Id. at 697.

The conclusion that Congress did not intend to imply a right of action is supported by the existence of extensive administrative remedies, by which the

federal government can enforce the loan guaranty program's regulatory provisions. Congress afforded the Secretary of Veterans Affairs discretion to impose sanctions on private lenders who, among other things, "negligently engaged in practices otherwise detrimental to the interest of veterans or of the Government[.]" 38 U.S.C. § 3704(d). The Secretary is authorized to "refuse either temporarily or permanently to guarantee or insure any loans made by such lender or holder and may bar such lender or holder from acquiring loans guaranteed or insured under [Title 38, Chapter 37.]" Id. Congress also established a Veterans Housing Benefit Program Fund, which it financed, in part, with penalties paid by private lenders for noncompliance with the rules and requirements established by the Secretary. 38 U.S.C. § 3722(c)(3)(D). The money collected from noncompliant lenders facilitates the Secretary's efforts to operate the loan guaranty program, to the benefit of veteran-borrowers. 38 U.S.C. § 3722(b).

Pursuant to his Congressionally delegated authority, the Secretary has promulgated regulations governing sanctions a lender might face for violation of the guaranty programs' rules. The regulations first impose certification obligations, which require lenders to assure that each loan meets "all statutory and regulatory requirements" and that they "were made in full compliance with the law and loan guaranty regulations[.]" 38 C.F.R. § 36.4840(k). The Secretary has instituted a

-14-

procedure for review of lender practices and has listed alternative sanctions with which the VA can penalize participants who do not comply.

The Under Secretary for Benefits, aided by an Investigating Official, assesses claims related to false certification.  38 C.F.R. § 36.4840(l).  The Under Secretary reports those certifications deemed false to a Reviewing Official.  The regulations even establish what information must be included in the Under Secretary's statement of findings.  38 C.F.R. § 36.4840(l)(1)(i)-(iv).  The Reviewing Official then determines either that the Under Secretary's conclusions were not supported by sufficient evidence; that the lender is liable for the regulatory violation; or that a complaint should be issued laying out the claims and the methods by which the lender can either correct the violations or contest them.  38 C.F.R. § 36.4840(l)(2).  If the lender elects to challenge the allegations, a hearing is held pursuant to the Program Fraud Civil Remedies Act of 1986.[4] 38 C.F.R. § 36.4840(m).  Upon a finding

---

[4] The regulations that implement the Program Fraud Civil Remedies Act are designed to:

> (1) Establish[] and provide[] the only administrative procedures and actions for imposing civil penalties and assessments against persons who make, submit, or present, or cause to be made, submitted, or presented, false, fictitious, or fraudulent claims or written statements to authorities or to their agents, and

> (2) Specif[y] the hearing and appeal rights of persons subject to allegations of liability for such penalties and assessments.

of liability, the U.S. government may seek civil remedy.  However, damages are capped at $10,000 or two times the Secretary's loss, whichever is greater.  38 C.F.R. § 36.4840(k)(3).

The VA also has other remedies.  For instance, the Secretary might seek to debar or suspend a participant lender, revoke the lender's automatic processing authority, or even bring a false claims action against the lender.  38 C.F.R. § 36.4840(n).  The VA has issued the Lender's Handbook ("Handbook") to clarify and summarize these alternative remedies.  VA Pamphlet 26-7, Revised, <u>available at</u> http://www.warms.vba.va.gov/pam26_7.html (last visited Nov. 19, 2009). Chapter 17 of the Handbook sets out sanctions for lender noncompliance.  The Handbook makes clear the VA's expansive authority to implement its regulations. Chapter 17 states:

> VA is authorized to impose sanctions against persons or entities who take actions which are detrimental to the VA loan guaranty program. The type and severity of the sanction imposed is based on
> • the type of participant (for example, lender, builder, management broker, etc.), and
> • the nature of the actions (for example[], fraud, significant deficiencies in performance, ongoing disregard for VA requirements, and so on).

---

38 C.F.R. § 42.1(b).

> Sanctions may be imposed in the form of
> •civil money penalties, and/or
> •the participant's full or partial exclusion from participation in the VA loan guaranty program for a certain period of time.

Id. at 17-1.  According to the Handbook, VA regulations reach "any person or entity conducting business related to the VA loan guaranty program," id. at 17-2; they assure the right of appeal for sanctioned individuals, id. at 17-1; and they allow for limited exclusion (program specific) and total exclusion (from all federal programs), id. at 17-4.  In addition to referencing the above mentioned civil sanctions, Chapter 17 also threatens lenders with withdrawal of automatic authority, the duration of which depends upon the gravity of the regulatory violation.  See id. at 17-7 to 17-10.  For instance, a lender might be withdrawn from automatic authority for 180 days where the VA receives "[s]ubstantiated complaints . . . that the lender misrepresented VA requirements to veterans to the detriment of their interests." Id. at 17-9.  The Handbook reinforces the possibility of debarment or suspension.  Id. at 17-15 to 17-17.  Finally, the VA warns that any participant in the guaranty program that engages in unfair contract provisions or marketing practices will be subject to severe sanctions.  Id. at 17-21.

The guidelines afford neither an express nor an implied private right of action to veteran-borrowers.  Further, pursuant to Congressional authorization, the Secretary of Veterans Affairs has implemented and enforced the veteran loan

guaranty program through an extensive administrative regime.  For reasons discussed more fully below, the court concludes that it would be inconsistent with Congressional intent and incompatible with regulatory scheme  to allow a private actor to use a civil RICO claim, with the prospect of treble damages, to enforce the VA regulations.

First Horizon analogizes this case to McCulloch, in which the plaintiff brought action against a lender for violating the Higher Education Act ("HEA") by failing to disclose information regarding the availability of a Federal Stafford Loan. 298 F.3d at 1220.  The plaintiff pled two counts, one based upon an implied cause of action and the second incorporating the failure to disclose into a civil RICO claim. After finding that the HEA neither expressly nor impliedly conferred a private right of action, id. at 1224-25, the court also rejected the RICO claim, finding the defendant had not committed a predicate act of racketeering.  Id. at 1226-27. Because the HEA afforded borrowers no private right of action and instead empowered the Secretary of Education to enforce its provisions, the Eleventh Circuit concluded that it would be inconsistent with Congressional intent to permit a private individual to enforce the statute's requirements with a RICO claim.  Id.

In his Opposition to Defendant's Motion to Dismiss, Mr. Brown points to several reasons that McCulloch is distinguishable from this case. (Opp'n to Def.'s

Mot. to Dismiss 18-19 [hereinafter Opp'n].)   He accurately characterizes the
McCulloch analysis as obiter dicta.  However, in Ayres v. General Motors Corp., the
Eleventh Circuit used this same logic to reject a comparable civil RICO claim.  Just
as in McCulloch, the court's analysis hinged on its evaluation of Congressional
intent.  The plaintiffs brought a Georgia RICO claim, asserting the predicate acts of
federal mail and wire fraud.  Specifically, the plaintiffs alleged that the defendants
"fraudulently concealed [a manufacturing defect] because of the great expense in
remedying the defect."  Ayres, 234 F.3d at 516.  This omission was fraudulent, they
contended, because the National Traffic and Motor Vehicle Safety Act ("Safety Act")
imposed a duty to disclose such a defect to consumers.  Id. at 517.

Even assuming that the Safety Act imposed a duty to disclose—a prerequisite
if non-disclosure were to constitute fraud—the Eleventh Circuit concluded that the
statutory violation could not serve as the "basis" for a civil RICO claim.  Id. at 524.
The court noted Congress did not create a means for private enforcement of the
Safety Act's requirements. Rather it instituted administrative remedies for violation
of its terms.  Id. at 522.  The Eleventh Circuit deemed it significant that the statute
enabled the Secretary of Transportation or interested individuals to seek hearings,
and that though it authorized the Attorney General to bring civil enforcement
actions, it imposed a specific liability cap.  Id.  The court concluded:

> In light of this extensive administrative scheme, we think it clear that Congress did not intend to equate a violation of the Safety Act's notification requirements in and of itself with the felony of mail or wire fraud. Moreover, given the limits on the civil penalties, the absence of a private right of action, and the option of private parties to petition for administrative action, *it is also clear that Congress did not intend* for a violation of the Safety Act's notification requirements to be the *basis* for a private civil RICO action, which would permit unlimited, treble damages.

Id. (emphasis added).

Just as in Ayres, in this case, Congress has authorized the Secretary of Veterans Affairs to institute extensive administrative remedies and to bring action on behalf of the government under the False Claims Act. It is also significant that, in a section requiring lenders to certify compliance with processing standards related to veteran-borrowers' credit worthiness, Congress set specific limits on lender liability:

> Any lender who knowingly and willfully makes a false certification under subparagraph (A) of this paragraph shall be liable to the United States Government for a civil penalty equal to two times the amount of the Secretary's loss on the loan involved or to another appropriate amount, not to exceed $10,000, whichever is greater. All determinations necessary to carry out this subparagraph shall be made by the Secretary.

38 U.S.C. § 3710(g)(4)(B). The presence of a Congressionally mandated liability cap supports the conclusion that the legislature designed the underlying statute to make affordable loans available to veterans by recruiting lenders both with the promise

-20-

of a VA guaranty and with other statutory protections.   To permit private enforcement of the VA regulations with a civil RICO suit would seem, therefore, inconsistent with the nature and purpose of the underlying statute.   Accordingly, violation of the VA regulations may not properly serve as the basis for a civil RICO action.

Mr. Brown also contends that <u>McCulloch</u> and <u>Ayres</u> are distinguishable because these cases turn upon the defendants' failure to comply  with disclosure obligations.   (Opp'n 16-17.)   In this case, argues Mr. Brown, the defendant affirmatively misrepresented the nature of the charges and used the mail and wires to further the scheme.   Mr. Brown says First Horizon committed mail and wire fraud, even absent the VA regulation.   (<u>Id.</u> at 17 ("[First Horizon] misrepresented the nature of the items for which Plaintiff was charged.   That is mail fraud even if no VA regulation existed.").)   "In this case," Mr. Brown argues, "[First Horizon] violated the duty not to lie, which does not arise from any regulation."   (<u>Id.</u> at 18).[5]

---

[5] The court has apprehensions as to whether absent a statute Mr. Brown has alleged misrepresentations that are material for mail fraud purposes.  If, as Mr. Brown requests, the court were to evaluate the mail fraud claims as if "no VA regulation existed[,]" (Opp'n 17), First Horizon would have allegedly lied about the manner in which it labeled the loan's costs and fees.  Absent federal regulations, however, Defendant would not have violated a cap on the size of certain fees nor violated an obligation to pay for any settlement and attorneys' fees that may have been charged.  Accordingly, First Horizon would merely have mislabeled attorneys' and settlement fees as title examination or abstract fees and, regardless of label, the borrower would have been responsible for all such costs.  The court is not persuaded that such an allegation would have "a natural tendency to influence, or

Though Mr. Brown's distinction between fraud perpetrated through non-disclosure and fraud perpetrated through misrepresentation carries some weight, the court is not persuaded that the distinction is dispositive.  Whether by omission or misrepresentation, a duty to be truthful has been neglected and the perpetrator satisfies the fraud element of a § 1341 or § 1343 offense.  Just as First Horizon allegedly violated a "duty not to lie," (Opp'n 18), the defendants in <u>Ayres</u> and <u>McCulloch</u> allegedly violated their duty to disclose.  Further, the Eleventh Circuit's analysis in both cases focuses on Congress's intent to limit the nature of the remedies, as evidenced by the absence of a private statutory right of action and the presence of an extensive administrative regime.  <u>See, e.g.</u>, <u>Ayres</u>, 234 F.3d at 522-23 ("The question of whether a private cause of action is conferred is essentially one of interpreting Congressional intent.").

It is noteworthy that Mr. Brown's characterization of his claims in response to the Motion to Dismiss is not wholly consistent with those made in his Amended Complaint.  Mr. Brown argues that he "did not allege the violation of a regulation

---

[would be] capable of influencing, the decision maker[.]" <u>Hasson</u>, 333 F.3d at 1271 (citation omitted).  In other words, in a situation in which veteran-borrowers were responsible for all attorneys' and settlement fees, merely calling these costs "title examination" or "abstract" fees is unlikely to dissuade a borrower from going forward with a loan.  At this stage, the court need not decide the materiality issue.  However, this analysis evidences the extent to which Mr. Brown's fraud-based RICO claims are, in fact, indelibly tied up in the VA regulations, an issue discussed in more detail below.

as a predicate act.   Instead, the allegations are that [First Horizon] made false representations that certain charges were for title work when in fact those charges were for attorney fees or settlement closing fees."   (Opp'n 20.)   At its core, Mr. Brown's Amended Complaint alleges two types of fraud:   (1) that First Horizon falsely certified that it "ha[d] not imposed and will not impose any charges or fees against the veteran borrower in excess of those permissible under the schedule set forth in [38 C.F.R. § 36.4312][,]"   (Am. Compl. ¶ 21), and (2) that the defendant charged fees in excess of those that are permitted by federal regulations and misrepresented these fees as "lawful."   For instance, the Amended Complaint states:

> First Horizon and the closing lawyers . . . defraud[ed] United States military veteran-borrowers *who are led to believe that they are being charged only lawful and authorized charges when, in fact, they are being charged illegal and unauthorized charges.*  Such use of the mail and wires violates 18 U.S.C. § 1341 (mail) and 18 U.S.C. § 1343 (wire).
>
> . . .
>
> [E]ach use of the mail, wires, or email by First Horizon and/or the closing lawyers or firms to send loan related documents and information, as well as illegal and unauthorized payments, violates 18 U.S.C. §§ 1341 and/or 1343 *because First Horizon knowingly participated in the scheme to fraudulently charge United States military veteran-borrowers illegal and unauthorized charges,* and used those mailings to further their interests in that scheme.

(Id. ¶¶ 68, 94 (emphasis added).)   Allegations of regulatory noncompliance pervade Mr. Brown's Amended Complaint.   Just as in Ayres and McCulloch, the duty First

Horizon is alleged to have violated is founded in federal statute and regulations, violation of which is remedied administratively.   Though the "duty not to lie"—which Mr. Brown alleges is the basis of his fraud claim—may not be regulatory in nature, the very lie is, in fact, rooted in the VA regulations.   Mr. Brown's suit is, at its core, an attempt to use a fraud-predicated civil RICO claim to enforce regulatory provisions.   In the absence of a private right of action and with the presence of an extensive administrative regime, enforcement of these regulations was intended to be left to the Secretary of Veterans Affairs.

Mr. Brown next argues that, because he has stated a RICO claim, the court's analysis should not "change simply because the defendant['s] conduct may have violated another federal law with no private right of action."   (Opp'n 22.)[6]   Mr.

---

[6] Similarly, Mr. Brown has characterized First Horizon's argument as based upon the principle that the VA regulations and its underlying act impliedly repeal RICO. However, First Horizon responds that the issue of whether one statute impliedly repeals another is a distinct argument from that which is before the court. (Reply in Supp. of Mot. to Dismiss 4 n.3.)  To support his argument, Mr. Brown relies on United States v. Philip Morris Inc., 263 F. Supp. 2d 72 (D.D.C. 2003).  However, unlike this case, Philip Morris was a criminal case in which the court specifically noted that the Government was not trying to enforce the Federal Trade Commission Act or the Federal Cigarette Labeling and Advertising Act, but instead was fulfilling its obligation to enforce the criminal RICO statute.  Id. at 77.  In that case, the defendant argued that a RICO charge would "effectively repeal[]" an agency's regulatory regime.  Id. at 76.  The question here is whether a private party may use RICO to enforce a regulatory scheme for which Congress did not afford a private statutory right of action and has, instead, delegated enforcement authority to a federal agency.  In fact, Philip Morris explicitly distinguished the two circumstances: "Here the Government has properly stated a RICO claim which it is specifically authorized to do under 18 U.S.C. § 1964(b) and is *not attempting to use RICO to bring a suit under the FTC Act that it could not otherwise bring.*"  Id. at 78 n.5 (distinguishing Danielsen) (emphasis added).

Brown suggests that a logical extension of First Horizon's argument would lead to the conclusion that "if challenged conduct violates a regulation that provides no private right of action, RICO's remedial provisions become categorically unavailable." (Opp'n 18.) He argues that this position is inconsistent with Eleventh Circuit precedent, citing Lee v. Flightsafety Services Corp., 20 F.3d 428 (11th Cir. 1994). In Lee, the Eleventh Circuit held that acts which violate the Service Contract Act ("SCA"), 41 U.S.C. § 351, could serve as the basis for a claim brought under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. As Mr. Brown notes, the court found that the two statutes did not conflict and that the plaintiffs could bring a claim under the latter, despite the fact that no private cause of action exists for the former. Id. at 431.

However, Lee can also be distinguished from the issues presented here. The RICO Act provides a discrete lists of federal statutes, the violation of which constitutes racketeering activity; the statutory provisions at issue in this case are not among those listed. See 18 U.S.C. § 1961(1). Here, the racketeering activity of which Mr. Brown complains are actions indictable under criminal mail and wire fraud statutes. (Am. Compl. ¶ 94 ("First Horizon knowingly participated in the scheme to fraudulently charge United States military veteran-borrowers *illegal and unauthorized charges,* and used those mailings to further their interests in that

scheme." (emphasis added)).)  The fraud in this case is bound up in the violation of VA regulations, and, as such, the RICO claim is at its core an enforcement of these regulations.

By contrast, under the facts of <u>Lee</u>, even in the absence of the SCA, the defendant would have allegedly deprived the plaintiffs of the *substantive* rights guaranteed by the FLSA.  The claim was brought under the FLSA's own private cause of action, to enforce rights guaranteed by that same statute, namely the proper compensation of employees for time worked.  See <u>Lee</u>, 20 F.3d at 431; <u>see also</u> 29 U.S.C. § 216(b) ("Any employer who violates the provisions of section 206 [(relating to minimum wage)] or section 207 [(relating to maximum hours)] of this title shall be liable to the employee or employees affected . . . .").

Just as in <u>McCulloch</u> and <u>Ayers</u>, the central issue now before this court is whether regulatory violation constitutes mail fraud, in other words, whether Congress intended to permit First Horizon's actions to comprise an integral and inseparable element of mail fraud, such that RICO could be used to enforce the underlying statute.  In both <u>McCulloch</u> and <u>Ayers</u>, the court focused its analysis on whether the plaintiffs' claims undermined Congressional intent to limit the means by which the underlying statutes could be enforced.  The language of <u>McCulloch</u> makes this clear:

In the instant case, the Court finds that Plaintiffs' mail and wire fraud claims are nothing more than purported HEA violations pled in RICO terms.  Thus, since Congress did not intend for Plaintiffs to have a private right of action against lenders for the failure to disclose Stafford Loan information, and instead provided administrative remedies, it follows that Congress could not have intended for that same failure to disclose to constitute a violation of the mail and wire fraud statute.

McCulloch, 298 F.3d at 1226-27; see also Ayres, 234 F.3d at 522 n.19 ("[T]he lack of a private right of action for a violation of the Safety Act's notification requirements *is strong evidence that a violation of these requirements does not constitute the predicate act of mail or wire fraud*." (emphasis added)).  "'The very fact that Congress enacted the [statute] with its complex framework for administrative recovery suggests that Congress did not contemplate that violation of [the statute] constituted the criminal felony of mail fraud.'"  Ayres, 234 F.3d at 524-25 (quoting Danielsen, 941 F.2d at 1229).  As noted, at its core, Mr. Brown's RICO claim is an attempt to enforce the VA regulations, for which Congress has not afforded a private cause of action, but instead authorized the Secretary of Veterans Affairs to enforce administratively.

Courts have prevented plaintiffs from disguising their attempts to use RICO to enforce statutes for which extensive administrative remedies offer the only relief. In language borrowed from the Second Circuit, the Eleventh Circuit noted: "'[a]rtful invocation of controversial civil RICO . . . cannot conceal *the reality that the gravamen of the complaint herein is [a violation of the underlying statute]*.'"  Id. at 525

(quoting <u>Norman v. Niagara Mohawk Power Corp.</u>, 873 F.2d 634, 637 (2d Cir.

1989)).  Though, Mr. Brown focuses his Response to the Motion to Dismiss on First

Horizon's alleged concealment of the violation of VA regulations, if this court were

to evaluate whether the "bundling" did in fact constitute mail or wire fraud it

would have to inquire into whether the lender actually violated the underlying

regulations.  The court would have to analyze whether First Horizon, through its

agents, charged "illegal and unauthorized" fees, (Am. Compl. ¶ 20), whether they

were in fact "impermissibly included in the principal loan amount financed by the

borrower in violation of applicable federal law," (<u>id.</u>) whether these fees exceeded

the one percent cap permitted by the regulations, and whether, as a consequence,

First Horizon's certification of regulatory compliance was false.   Answering this

series of questions would encroach upon the Secretary of Veterans Affairs's

Congressionally delegated authority to enforce the regulations.[7]  As such, to permit

Mr. Brown to bring a RICO suit to enforce the VA regulations would be inconsistent

---

[7] An unpublished Southern District of New York decision, to which <u>McCulloch</u> cites approvingly, supports this conclusion.  <u>McCulloch</u>, 298 F.3d at 1227 (citing <u>New York Inst. of Dietetics, Inc. v. Great Lakes Higher Educ. Corp.</u>, No. 94-CIV-4858, 1995 WL 562189, at *4 (S.D.N.Y. Sept. 21, 1995)).  In <u>New York Institute of Dietetics</u>, the court concluded that violation of the underlying statute, HEA, and *concealment of these violations*, could not constitute mail and wire fraud for the purposes of bringing a private RICO claim.  <u>New York Inst. of Dietetics</u>, 1995 WL 562189, at *4.  Because Congress conferred exclusive enforcement authority to an administrative agency, neither violation of the statute nor concealment of that violation could serve as the basis for the civil RICO claim.  <u>Id.</u>

with Congressional intent and with the purposes of the statute — making affordable loans available to veterans by luring lenders with the VA's guaranty and other protections (such as the promise of limited liability). See McCulloch, 289 F.3d at 1227 ("[I]n light of the HEA's enforcement scheme, granting the Secretary of Education exclusive authority to remedy violations of the HEA, and the fact that the HEA does not confer a private right of action, the Court finds that . . . [violation of the HEA] cannot *form the basis* for a civil RICO claim seeking treble damages and injunctive relief.").

In a case to which both McCulloch and Ayres cite with approval, the D.C. Circuit reached a similar conclusion. In Danielsen the plaintiffs claimed that their employers, which were under contract with the U.S. government, intentionally and continuously underpaid employees by placing them in job classifications for which wages were set below those deserved in violation of the SCA. 941 F.2d at 1225, 1231. The plaintiffs first sought the administrative relief made available under the statute, winning a favorable ruling from the Administrator of the Wage and Hour Division at the Department of Labor's Employment Standards Administration. Id. at 1225-26 (noting that, as to some of the contracts, the issue was on appeal when the plaintiffs filed suit). Meanwhile, the plaintiffs brought four RICO counts in federal court, seeking treble damages for backpay and other benefits. Id. at 1226. The D.C.

Circuit noted that the SCA explicitly dealt with the categorization and wage rate of employees, that it provided no private cause of action and instead created an extensive statutory scheme for administrative relief. Accordingly, it rejected the argument that "violation of the SCA give[s] rise to a private civil action under RICO in addition to the remedies provided under the SCA[.]" Id. at 1227.

Mr. Brown attempts to distinguish Danielsen, arguing that "[a]s the plaintiffs did not allege deceptive conduct, mailing documents in connection with a contract that violated the SCA was not mail fraud." (Opp'n 21.) Based on this, Mr. Brown argues that Danielsen only stands for the proposition that, without more, violation of the SCA does not constitute mail fraud and cannot support a RICO claim. (Id.)

However, the Danielsen plaintiffs did in fact allege deceptive conduct, namely that their employer placed them in a lower work classifications, Danielsen, 941 F.2d at 1225, and, according, intentionally underpaid them for work performed, id. at 1231.[8] Despite the mislabeling, the court questioned whether mis-

---

[8] Referring to Miscellaneous Service Workers v. Philco-Ford Corp., 661 F.2d 776 (9th Cir. 1981), the D.C. Circuit observed that because Congress intended to limit available forms of relief, the Ninth Circuit refused to allow plaintiffs to bring a secondary cause of action for "deceit and misrepresentation in falsely advising plaintiffs that the SCA did not apply to their contract, an alleged deception at least as egregious as picking the wrong classifications, the 'racketeering' supposedly underlying the present action." Danielsen, 941 F.2d at 1228 (citation and internal quotations omitted). This observation further supports the conclusion that the core issue is whether the absence of a private cause of action, coupled with extensive administrative remedies, should bar Mr. Brown from using a private RICO cause of action (with treble and uncapped punitive damages) to enforce the

categorization of employees could be considered sufficiently deceptive to constitute fraud, for the purposes of section 1341. Id. at 1229. As with McCulloch and Ayres, the analysis turned on an interpretation of legislative intent: "To call the violation of the SCA 'a pattern of racketeering' does nothing to persuade this Court that Congress intended the SCA to create a private cause of action." Id. at 1228. Because Congress did not provide a private cause of action and instead created a "comprehensive administrative rubric for protection for federal service workers[,]" the court held that it would be inconsistent with Congressional intent to allow the plaintiffs to proceed in their claim for treble damages. Id. at 1227 (citation and quotation omitted).

In another case on which McCulloch and Ayers rely, the Second Circuit held that employees at a nuclear plant could not bring RICO claims to enforce whistle-blower protections afforded by the Nuclear Regulatory Commission's regulations. Norman, 873 F.2d at 635. The underlying statute, the Energy Reorganization Act, ("ERA") established an administrative system to review whistle-blower claims. These regulations set out specific investigation procedures to guide the Secretary of Labor's review of complaints. Id. at 637. After unsuccessfully seeking administrative relief, via the regulations themselves, and judicial relief, via 42 U.S.C.

_____

VA regulations.

§ 1983, the plaintiffs "decided to have another go at Niagara, this time relying on ubiquitous RICO."  Id. at 636.  The court refused to permit the plaintiffs "[a]rtful invocation of controversial civil RICO . . . [to] conceal the reality that the gravamen of the complaint" was a violation of the ERA.  Id. at 637.

Just as with the cases discussed above, "[o]nce all the fat is trimmed away, we are left with little more than the allegations that" First Horizon violated the VA regulations.  Id. at 636 (citation and internal quotations omitted).  Though this case is, to some extent, distinguishable in that Mr. Brown has alleged bundling of fees to conceal the unlawful charges, he is, at bottom, attempting to enforce the VA regulations.  Because these regulations do not afford a private cause of action to veteran-borrowers and because the Secretary—in exercising the powers conferred to him by Congress—established a regulatory regime to remedy such a violation, First Horizon's actions do not constitute violation of § 1341 or § 1343 under the facts of this case.  It is inconsistent with the legislative intent to permit Mr. Brown to bring a class action RICO suit that seeks to enforce the VA regulations by demanding treble and uncapped punitive damages.

For the foregoing reasons, the court GRANTS First Horizon's motion to dismiss Mr. Brown's federal RICO claim, brought pursuant to 18 U.S.C. § 1962(c).

Mr. Brown's conspiracy claim, brought under 18 U.S.C. § 1962(d), fails alongside the substantive count.

### B.     State RICO Claims

Mr. Brown's Georgia RICO claims are predicated on federal mail and wire fraud as well as on residential mortgage fraud, in violation of O.C.G.A. § 16-8-102. To the extent that the state claims are based upon 18 U.S.C. §§ 1341 and 1343, the above analysis applies with equal force.  See Ayres, 234 F.3d at 525.  Whether the same logic can be applied to the mortgage fraud predicate is uncertain.

However, Mr. Brown's basis for filing suit in federal court is federal question jurisdiction.  (See Am. Compl. ¶ 3.)  With all federal claims dismissed, the court's jurisdiction over the remaining state matters is discretionary.  28 U.S.C. § 1367(c)(3). The surviving state RICO claims no longer incorporate federal mail and wire fraud elements.   Accordingly, this court declines to interpret the Georgia residential mortgage fraud statute, as a predicate to Georgia RICO claims.

The COURT DISMISSES WITHOUT PREJUDICE Mr. Brown's remaining state law RICO claims.  See McCulloch, 298 F.3d at 1227 ("The Court may decline to exercise jurisdiction over state-law claims, where the Court has dismissed all the federal claims over which it has original jurisdiction." (citing 28 U.S.C. § 1367(c)(3)).

### IV.   Summary

For the foregoing reasons, Mr. Brown's Motion for Hearing [Doc. No. 23] is DENIED. First Horizon's two Requests for Judicial Notice [Doc. Nos. 9, 26] are DENIED. First Horizon's Motion to Dismiss Plaintiff's Class Action Complaint [Doc. No. 10] is DENIED. Finally, Defendant's Motion to Dismiss the First Amended Complaint [Doc. No. 24] is GRANTED as to Counts III and IV. Counts I and II are DISMISSED WITHOUT PREJUDICE, insofar as they rely on the predicate act of residential mortgage fraud, in violation of O.C.G.A. § 16-8-102.

IT IS SO ORDERED, this 20th day of November, 2009.

s/Beverly B. Martin
BEVERLY B. MARTIN
UNITED STATES DISTRICT JUDGE